### HART v. THOMPSON et al.

(Supreme Court, Appellate Division, First Department. November 13, 1896.)

1. MAKING OF CONTRACTS—WHAT CONSTITUTES.

Defendant, by letter, offered to employ plaintiff on specified terms. Plaintiff testified that in his reply, which had been lost, he accepted the proposal, but his testimony was uncorroborated. Defendant testified that such acceptance was conditional, in which he was corroborated by evidence of other negotiations as to terms, and by a letter from defendant rejecting a part of the conditions. That letter plaintiff never answered. *Held,* that no contract was made by the letters.

2. CUSTOMS—CANCELLATION OF CONTRACTS.

Where the duration of plaintiff's employment by defendant was not fixed by the contract, and plaintiff has introduced evidence of the customary duration of such contracts, defendant may show a custom of the business to cancel contracts on certain notice.

**3. Same—Contemporaneous Construction of Contract.**
  Where the terms of a contract are disputed, evidence of conversations between the parties during the negotiations is competent as showing their contemporaneous construction of the contract.

Appeal from judgment on report of referee.

Action by John Hart against Denman Thompson and another for breach of a contract. There was a judgment in favor of plaintiff, and defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

John T. Easton, for appellants.

Wm. Armstrong, for respondent.

INGRAHAM, J. This action was brought to recover·damages for a breach of a contract whereby the plaintiff was to perform certain work, labor, and services as a professional actor in a certain part or character, called "Hiram Pepper," in a drama, comedy, or play called "The Two Sisters"; "that is to say, for a period of forty weeks, beginning August, 1888, at the agreed salary or compensation of seventy-five dollars per week for each and every week during said theatrical season." The answer of the defendants denies the making of the contract or agreement alleged, and alleges that on or about the 5th day of March, 1888, the plaintiff was engaged and employed by the defendants to render certain services in a certain play, known as "The Two Sisters"; that said engagement or agreement was for no definite period, but that the same·could be terminated by either party thereto on giving two weeks' notice of his or their intention to do so; and that the said notice was given in the middle of September, 1888, whereupon the said contract became terminated and at an end.

The plaintiff, to prove his case, introduced three letters written by the defendant Ryer, with secondary evidence of the contents of the letters written by plaintiff in answer thereto; the original letters written by plaintiff not being produced, evidence having been given that the same had been lost or destroyed. The making of the contract sued on depended upon the answer by plaintiff to the defendants' letter of March 1, 1888. The contents of this letter were proved by the evidence of plaintiff. The substance of that answer was that "I would accept the terms. He said in his letter that $75 was the limit, and, joking, I wrote that 'I would play the limit.' I accepted the terms." The plaintiff further testified that he did not add any condition; and it is this letter written by plaintiff in answer to the defendants' letter of March 1, 1888, which plaintiff alleges made the .contract sued on, and which is alleged to be a contract for a specified time, viz. for a theatrical season, a period of 40 weeks, beginning in August, 1888. In looking through the letters which have been produced, or the testimony of the contents of letters not produced, we look in vain for any statement as to the period for which the plaintiff was to be employed. The first letter of defendant Ryer to plaintiff, dated

February 20, 1888, was a proposition to the plaintiff to take part in a venture of the defendants' in the production of a new play, which was to commence in August, in the neighborhood of New York City. In that, Ryer proposed that the plaintiff should take part in the play, in substance asking what salary he would accept, and said that he would submit plaintiff's proposition to Mr. Thompson, his co-defendant, and would then notify the plaintiff if it was satisfactory. In answer to that, the plaintiff wrote to defendant Ryer, and said that he (the plaintiff) would like to know what the part was, so he could understand it. There was no statement in this latter as to the term of the employment. It was simply a proposition to take part as an actor in the production of a play which the parties then intended to produce in the following August. The defendant Ryer wrote to plaintiff in answer to the request before mentioned, on March 1, 1888, giving certain extracts from the play, and stated: "This piece is accepted, and will be produced at the Fourteenth Street Theater, N. Y. City, on November 12th, for a run;" told the plaintiff that $75 a week was as far as they could go. "That amount is our limit. Surely, a season at home is of some value to you. Think it over, and, if you accept, notify me at once, that I may chase away those that may seek 'Pepper.'" It was in answer to this letter that plaintiff swears that he sent the communication to the defendants in which he said that he would accept the terms. The defendant Ryer contradicts the plaintiff as to the terms of the plaintiff's reply to this letter of March 1st. Ryer says that plaintiff's reply to that letter of March 1st was that "he would play the limit provided I would pay his hotel bills and railroad fares; his salary provided I would add to it the railroad and hotel bills." There is a sharp conflict of evidence as to this reply, plaintiff testifying that it was a mere acceptance of the terms theretofore proposed, the defendant testifying that it was a new proposal, which was to add to the salary of $75 a week plaintiff's railroad fares and hotel bills.

The plaintiff also produced a letter from the defendant Ryer, dated March 5, 1888, which contains this statement: "Railroad fares, yes; hotel bills, nay, nay. * * * $75.00 and railway fares." To that letter it is not pretended that any reply was sent, and a question of fact was thus presented as to whether or not the plaintiff ever did accept, in writing, the defendant's proposition to employ him at $75 a week and railroad fares,—whether, in fact, a contract was made by this correspondence between the parties. The terms of this last letter by defendant Ryer strongly corroborate his testimony as to the fact that, at the time it was written, no contract had been finally made, but that the proposition of the defendant to plaintiff was met by a counter proposition of plaintiff to defendant that defendant would pay, in addition to $75 a week, the plaintiff's railroad fares and hotel bills while traveling and engaged in the production of the play. Putting it, therefore, most strongly for plaintiff, a question of fact was presented to be determined as to whether or not any contract was made by this

correspondence. The defendant having denied the receipt of the letter as testified to by plaintiff, and having testified that plaintiff's letter contained a new proposition, and not an acceptance of the terms of the letter of March 1st, the defendant was asked as to what took place between the defendant and Mr. Hart in respect to engaging Mr. Hart to take part in "The Two Sisters." That was objected to as incompetent, and the objection sustained. To that defendants excepted. A series of questions was then asked the defendant as to what the final agreement was. Objections were made to most of these questions, which objections were sustained. The defendant, however, was finally allowed to testify that the plaintiff verbally acceded to the terms of $75 a week and his railroad fares; and subsequently, on redirect examination, he was allowed to testify:

"At last, we arranged matters that it should be for $75, his railway fares, and two weeks' notice to either side; that I could give him two weeks' notice to quit, or he could give me two weeks' notice that he would quit. There were other conversations, of course, but I don't follow them up. I don't remember them."

The testimony of the defendant as to the contract having been made verbally between the plaintiff and the defendant Ryer after the return of the plaintiff in March, 1888, was corroborated by several witnesses as to interviews between plaintiff and Mr. Ryer at Mr. Ryer's house.

We are inclined to think that the finding of the referee, upon this testimony, that any contract was finally made by these letters alone, is against the weight of evidence. It depends entirely upon the recollection of the plaintiff as to the contents of a letter written several years before the trial. It is contradicted by the letter written by the defendant to the plaintiff, which the plaintiff produces; and from that it appears that the contract had not then been made, but that the letter of plaintiff in answer to defendant's letter of March 1st contained a counter proposition that the defendant should pay, in addition to $75 a week salary, the plaintiff's hotel bills and railroad fares. Thus, the testimony of the defendant Ryer, corroborated by the testimony of his wife and brother, as to negotiations in regard to terms after the plaintiff's return, is in harmony with the letter that Ryer wrote to plaintiff, and which the plaintiff himself produced, while the plaintiff's story as to the contents of his letter is entirely uncorroborated. He makes no attempt to explain the meaning of the letter of Ryer to him, dated March 5, 1888, which, in terms, is a refusal of the proposition made by plaintiff to pay the hotel bills. We think, therefore, that the finding of the referee that such a contract was made by this letter of the defendant, and accepted by the plaintiff, is against the weight of evidence, and that the judgment, for that reason, should be reversed.

In addition, we think that the referee erred in refusing to admit evidence of custom. The defendant called a witness, Erlanger, who was a theatrical manager, and familiar with the making of

contracts in the theatrical profession. He was asked this question: "In the making of contracts for the engagements of players to take parts in a new play, is there an established, well-understood custom or usage providing that either party shall have the right to cancel the contracts on two weeks' notice?" This was objected to as irrelevant, incompetent, and immaterial. That objection was sustained, and defendants excepted. We think this evidence was competent. As before stated, in none of the letters is there any statement made as to the period for which the engagement was to run. The only phrase in any of the letters that referred to any season is contained in the letter of March 1st, in which the defendant says: "If you take it, you will likely have as pleasant a season, or many of them, as you have ever had. That amount is our limit. Surely, a season at home is of some value to you." The plaintiff was allowed to testify that a regular theatrical season was understood to mean 40 or 41 weeks, and thus the plaintiff relied upon the custom in the theatrical business in New York to make out any employment for any particular time. We think it was entirely competent for the defendant to prove that there is a well established and understood custom or usage that either party should have a right to cancel such an agreement upon two weeks' notice. As before stated, there was no express proposition to engage the plaintiff for any particular time. In neither of the letters does the defendant Ryer say that they will retain the plaintiff in the position offered to him for the season, or for 40 weeks, or for any other time. The defendant's letter stated that the piece was accepted, and would be produced at the Fourteenth Street Theater for a run; but that, certainly, does not mean that the run would last for any particular number of weeks, nor could that be construed into a covenant that the plaintiff would be employed for this season in New York. In speaking of the engagement, the defendant subsequently says that, if he (the plaintiff) accepted this employment, he would likely have as pleasant a season, or many of them, as he had ever had, and that, surely, a season at home would be of some value to him. This language cannot be construed into meaning that the term of the employment, if accepted by plaintiff, would be for the whole season of 40 weeks. The most that could be said is that there was ambiguity as to the time for which the employment was to last. That could be determined by the construction which had been given to the contract by the parties and the usages of the profession, and by such other evidence as would tend to show the intention of the parties. The usage of the profession in regard to the right to discharge upon notice an actor employed under the circumstances here detailed would be certainly most material to determine the intention of the parties at the time of the making of this contract.

There is one other question to which attention should be called. Upon cross-examination of the plaintiff he was asked: "Had you any conversation with Mr. Ryer or with Mr. Thompson at any time in relation to the term of your engagement, or as to the conditions

under which you were to be engaged?" That was objected to, on the ground that the conversation was merged in the letter from the defendant Ryer to Mr. Hart, which expressly described the terms of the employment; and that objection was sustained, on the ground that an agreement was made out in the correspondence, and that, unless something happened subsequently to change its terms, the question was not proper. We think it was error to exclude that question. As before stated, the contemporaneous construction which was given to this proposal, if it was accepted by the plaintiff, would be most material in determining the term for which the plaintiff was employed, and any conversation between the plaintiff and the defendants at any time was material in this connection. In addition to that, the defendant had denied the making of the contract, and had alleged a subsequent contract, different in terms from that alleged by the plaintiff, by which the defendant had the right to terminate the employment upon two weeks' notice. The defendant had the right to cross-examine the plaintiff as to this new agreement, and, while it might be within the discretion of the referee to refuse to allow such cross-examination at this stage of the trial, the ruling of the referee was not placed upon that ground, but upon the ground that an agreement had been made by the correspondence, and that it was incompetent to cross-examine the plaintiff, upon whose testimony reliance was placed to prove the correspondence.

There are many other exceptions to rulings of the referee upon questions of testimony. As there must be a new trial, the same questions may not be presented again, and it is not necessary that we should examine them.

The judgment should therefore be reversed, and a new trial ordered before another referee, with costs to the appellants to abide the event. All concur.