**FEDERAL EXPRESS CORPORATION,**
**Appellant,**

v.

**PAN AMERICAN WORLD AIRWAYS,**
**INC., Appellee.**

No. 79–1506.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 15, 1980.

Decided July 1, 1980.

Robert L. Brown, Harrison & Brown, Little Rock, Ark., for appellant.

Boyce R. Love, Friday, Eldredge & Clark, Little Rock, Ark., for appellee.

Before STEPHENSON and McMILLIAN, Circuit Judges, and THOMAS,* Senior District Judge.

McMILLIAN, Circuit Judge.

Appellant Federal Express Corporation, which operates an air express cargo service, appeals from a judgment of the district court[1] dismissing its claim of damages for breach of contract in a diversity action against appellee Pan American World Airways, Inc. For the reasons stated below, we affirm.

This case involves contracts for the sale of a particular kind of jet aircraft called the Falcon 20 Jet, manufactured by Avions Marcell Dassault and marketed at the time of the contracts in the United States by the Business Jets division of appellee. The controversy is over a provision in the sales contracts calling for appellee to provide to appellant (the buyer) "initial training" for flight personnel on a "flight simulator," a machine designed to recreate conditions that might be encountered in flight and to test the responses of the trainee. While we do not attempt to detail the facts of the case, which are admirably set forth in the district court's opinion, some background is required for an understanding of the parties' dispute.

Appellant Federal Express came into existence after Frederick W. Smith, a young but experienced pilot and aircraft industry businessman, sought to set up a new kind of air express delivery service. He planned to use Falcon 20 Jets for this purpose, an inventive idea which created a new function for what had been primarily a "corporate jet," normally used by large enterprises for transportation of personnel. Smith took his plan to Mr. C. C. Flemming, an executive officer of the Business Jets division of appellee, who was supportive, and the parties arranged in 1971 for a sale of a total of twenty-five jets, two at once and the other twenty-three for future delivery. After some delays while appellant obtained financing and while regulatory changes were made which enabled appellant to go into business, the twenty-three aircraft were delivered between October, 1972, and May, 1973.

The contracts called for delivery of the aircraft in a "green" condition, that is, without modifications for appellant's particular needs and without finished instruments or interiors. Appellant subsequently modified the aircraft as they were delivered, with the modifications on the last aircraft completed by December, 1974.

The contracts also called for appellee to provide certain training for appellant's personnel, including the "initial training" for aircraft crews on the flight simulator which is at issue in this case. In regard to this training, the schedule provided by appellee

---

* The Honorable Daniel H. Thomas, United States Senior District Judge for the Southern District of Alabama, sitting by designation.

1. The Honorable Bruce M. Van Sickle, United States District Judge for the Eastern District of Arkansas.

with the first two aircraft purchased in 1971 varied from that provided under the contract for the twenty-three aircraft delivered in 1972–73. The training schedule covering the first two aircraft provided,

"Seller shall arrange to provide, at its expense, initial training of flight and maintenance personnel of buyer as follows: . . . Flight Simulator Training. . . . Up to 30 hours per crew. . . . "

A similar printed training schedule was appended to the subsequent contract for the twenty-three with a typed alteration in the first sentence to read,

"Seller shall arrange to provide, at its expense, for each Aircraft, initial training of flight and maintenance personnel. . . . "

A modification of this provision occurred in September, 1972, when appellant had encountered delays in obtaining financing which postponed the delivery dates envisioned under the contract, and the parties negotiated a letter agreement under which appellant agreed to waive all rights to training under the original contract except the simulator time.

The only flight simulator for the Falcon 20 aircraft in existence at the time of the contract was owned by a firm called Flight Safety, Inc., which had purchased the simulator from appellee. Under terms of the simulator sale, Flight Safety agreed upon notice of appellee to supply to customers of the Business Jets division who purchased Falcon 20 aircraft "initial training" of flight personnel, "including use of the Simulator as necessary," without charge to Business Jets or the customer.[2] Business Jets, however, apparently did not notify Flight Safety, Inc., of the sale to appellant.

Nor did appellant request training until July, 1975. In the meantime, appellant made certain other arrangements for training. It set up a Veterans Administration approved school for veterans who could make use of federal training funds and trained about 400 Falcon Jet pilots, about 200 of whom appellant employed. In 1973, it ordered its own Falcon simulator, a $1.25 million machine, but its financial sources balked and appellant transferred the simulator to Flight Safety, Inc., where it was installed in early 1975. On July 3, 1975, having sold its flight school, appellant contracted with Flight Safety, Inc. to provide simulator training for flight personnel on a continuing basis, allowing appellant 1,000 hours of training a year and covering Falcon Jets as well as other aircraft.[3]

A week later, on July 10, 1975, appellant requested from appellee the "30 hours per crew, per aircraft, for initial flight simulator training" appellant considered itself entitled to under the sales contracts. Appellee refused, and this lawsuit ensued.

The result below hinged upon the meaning of "initial training" of flight personnel in the sales contracts. Appellant urged that the meaning of "initial training" must be taken from the Federal Aviation Administration regulations covering training of

---

**2.** Appellant rather vigorously asserts that the contract between appellee and Flight Safety, Inc. covered the simulator training claimed by appellant in this case and required Flight Safety, Inc. to provide 30 hours of simulator training at no charge to appellee. The district court made no such finding. Appellant at oral argument argued that its Flight Safety contract may not have covered the training. Neither of the parties explained the facial discrepancy between the two contracts, one calling for 30 hours of simulator training and the other for simulator training as required. In any event, we do not consider this matter essential to our resolution of this case, as this is not an action to enforce appellee's contract with Flight Safety, Inc.

The parties make other assertions of facts which were not found by the district court which we do not regard as established. *See, e. g.,* note 3 *infra.* We note that in a technical commercial transaction of this kind we are especially reluctant to consider facts not found by the district court which heard the testimony and was in a much better position to know what findings are actually supportable.

**3.** At oral argument appellee contended that appellant's contract with Flight Safety, Inc. called for appellant to purchase *all* of its required simulator training under the contract. The district court made no such finding, and appellee provides us no clue why we should disagree with the district court. We therefore consider appellee's contention as unfounded.

flight crew members, which defines "initial training" as that "required for crew members" in order to qualify them for service on a type of aircraft. 14 C.F.R. § 121.400(c)(1) (1979). Under appellant's interpretation, therefore, the phrase "initial training" refers to the status of the crew to be trained, and the "initial training" for pilots provided under the contracts would be available to appellant to train two crew members per aircraft at appellee's expense at any reasonable time upon appellant's demand. The district court found that, under the contracts for the first two aircraft, this interpretation would be proper.

The court also found, however, that the phrase, "for each aircraft, initial training," which appeared in the contract for the additional twenty-three aircraft, was on its face susceptible of a second interpretation which appellee advanced: whatever training of crew the buyer needed at the time of the purchase to put the aircraft into its initial operation. Under appellee's interpretation, therefore, "initial training" refers to the status of the aircraft, and under the contract training would be available for two crew members per aircraft only as required at the time of purchase to provide an initial crew for appellant to operate the aircraft.

The court concluded that the phrase "initial training" was ambiguous. Applying the law of New York, which has adopted the Uniform Commercial Code, New York Uniform Commercial Code Annotated (McKinney 1964) (hereinafter NYUCC), the court resolved the ambiguity by interpreting the writing in light of trade usage. NYUCC §§ 1–205(4), 2–208(2). Finding that the trade usage was for the seller of this kind of aircraft to provide only initial training for an original crew to put a particular aircraft into service for a buyer, the court interpreted the writing as consistent with this usage. Finally, the court held that appellant waived entitlement to the training by obtaining it through other means.

Appellant argues that the district court erred on three points, each of which requires reversal: (1) appellant contends that the contract was not ambiguous and clearly referred to initial training in the sense of the training required to qualify any crew member; (2) appellant contends that trade usage for sale of a single aircraft as a "corporate jet" does not apply to this sale of a fleet of aircraft intended to be used as cargo vehicles; and (3) appellant contends that it did not waive its entitlement to simulator time, because it specifically reserved the simulator time in the September, 1972, letter agreement and demanded the simulator training within a reasonable time. We discuss these contentions in turn.

As a preliminary matter, we note that the parties agree that New York law controls, and we note also that because the contract was primarily for the sale of goods, NYUCC § 2–105(1), the Uniform Commercial Code applies to it. *See Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974); *cf. Milau Associates, Inc. v. North Avenue Development Corp.*, 42 N.Y.2d 482, 368 N.E.2d 1247, 398 N.Y.S.2d 882 (1977) (discussing dichotomy of sales and services contracts). We note that the district court decided the case under the Code and neither party challenges the applicability of the Code to this transaction.

■ Turning to the ambiguity issue, appellant's own argument suggests that the contract was ambiguous. Although appellant contends that the regulation of the Federal Aviation Administration controls the meaning of the parties' written agreement, there is a facial difference between the regulation which defines "initial training" of flight crew and *dispatchers*, 14 C.F.R. § 121.400(c)(1) (1979), and the written sale agreement which calls for "initial training" of flight crew and *mechanics*. On this basis alone, we would consider some doubt justified that the contract phrase referred to the same thing the FAA regulations referred to. Furthermore, we think it would do violence to the plain sense of the words to read the phrase "for each aircraft, initial training" without understanding the

phrase to refer at least ambiguously to the training required for initial use of the aircraft. We therefore fully agree with the district court's conclusion that the contract was ambiguous.

Nor do we have any difficulty with the fact that neither party urged the court below to find the writing ambiguous. (Rather, each party contended that the writing unambiguously supported its position.) "The fact that prior to the trial court's ruling both parties, though each pressing for a different interpretation, urged the agreement was unambiguous and therefore only a question of law was presented, is not controlling." *Ehrlich v. Abrams Instrument Corp.*, 53 A.D.2d 825, 385 N.Y.S.2d 299, 301 (1976).

Next, appellant asserts that usage of trade in sales of "corporate jets" was inapplicable to this case, because sale of a whole fleet of aircraft for cargo service is unique and fundamentally different than other sales of single aircraft for personnel transport purposes.[4] In particular, appellant urges that when used as a "corporate jet" the Falcon would only require one flight crew for relatively infrequent use, while the use of Falcons in a cargo business required five or six different flight crews for each aircraft because of much more frequent use. Therefore different training provisions would be anticipated under this sale.

■ Whatever the validity of this distinction, it does not avail appellant. The critical point is that this transaction involved the same aircraft and virtually the same written agreement as the "corporate jet" sales. The usage in those cases therefore

had some relevance to this transaction, and the trial court clearly was correct in considering it. NYUCC § 1–205, N.Y. Annotations, Comment 3; *Valley National Bank v. Babylon Chrysler-Plymouth, Inc.*, 53 Misc.2d 1029, 280 N.Y.S.2d 786 (Sup.Ct.), aff'd, 28 A.D.2d 1092, 284 N.Y.S.2d 849 (1967); see also *B. M. Heede, Inc. v. Roberts*, 303 N.Y. 385, 103 N.E.2d 419 (1952) (trade usage available to explain technical term); *N. V. Leo De Winter & Co. v. B. N. S. International Sales Corp.*, 16 A.D.2d 763, 227 N.Y. S.2d 735 (1962); Kirst, *Usage of Trade & Course of Dealing*, 1977 U.Ill.L.F. 811, 839. The existence and scope of trade usage is a matter of fact. NYUCC § 1–205(2); 1 R. Anderson, Uniform Commercial Code § 1–206–6. "In case a dominant pattern has been fairly evidenced, the party relying on the usage is entitled to go to the trier of fact on the question of whether such dominant pattern has been incorporated into the agreement." Draftsmen's Comment 9, NYUCC § 1–206. The dominant pattern in this case was the pattern that buyers of Falcon aircraft had a contract right to certain training for the first crew to fly the aircraft. We find no error in the conclusion of the trial court that usage of trade shown by other sales of Falcon Jets was applicable to this contract to explain the meaning of the indefinite term "initial training," and we certainly see no reason to find this conclusion clearly erroneous. Fed.R.Civ.P. 52(a).

■ Appellant argues that in any event New York law requires construction of ambiguities in a writing against the drafting party. It is true that New York courts

---

4. Appellant suggests that it was misled at trial by the district court which indicated at one part of the trial in passing that custom of trade would not be determinative. Appellant asserts that thereafter it considered the case to depend entirely upon the "clear language of the contract." If so, appellant should have looked more closely at the Uniform Commercial Code, which rejects the law of *custom of trade* as a guide to contract meaning, and instead adopts the approach that the language is to be read in light of *trade usage*, a very different approach

according to the comments of the code draftsmen. See NYUCC § 1–205 and draftsmen's comments 4 and 5 to § 1–205. *See generally* Levie, *Trade Usage and Custom Under the Common Law and the Uniform Commercial Code*, 40 N.Y.U.L.Rev. 1101 (1965); R. Nordstrom, Handbook of The Law of Sales 157 (1970). Consideration of trade usage was not only consistent with, but also required for, determination under the Code of the meaning of the contract language. NYUCC §§ 1–205, 2–208.

have shown some tendency to do so where the party who drafted the agreement takes a position which has little support outside some verbal ambiguity. *See Chase Manhattan Bank, N. A. v. Mehlman*, 59 A.D.2d 694, 398 N.Y.S.2d 686 (1977), *aff'd*, 46 N.Y.2d 802, 386 N.E.2d 833, 413 N.Y.S.2d 922 (1978); *General Venture Capital Corp. v. Wilder Transportation, Inc.*, 26 A.D.2d 173, 271 N.Y.S.2d 805 (1966). But the Uniform Commercial Code specifically requires the written language of the parties' agreement to be construed consistently with applicable trade usage, and this statutory rule of construction must prevail. NYUCC § 1–205. *See also Frye v. State*, 192 Misc. 260, 78 N.Y.S.2d 342, 347 (Ct.Cl.1948). "A contract must be construed according to the custom and use prevailing in a particular trade." *Edison v. Viva International, Ltd.*, 70 A.D.2d 379, 421 N.Y.S.2d 203, 205 (1979) (contract for publication of magazine article).

■ Finally, appellant challenges the district court determination that it waived entitlement to simulator training by delaying its demand for the training and by obtaining simulator training through other means, including its own flight school and its own separate contract with Flight Safety, Inc., for simulator time. Appellant contends that the letter agreement of September, 1972, specifically did not waive appellant's entitlement to simulator time. As the parties saw fit to use a written waiver at that time, suggests appellant, no subsequent non-written waiver of simulator time would be effective. But the Uniform Commercial Code specifically recognizes non-written waivers. NYUCC § 2–209(4). Such a waiver under the Uniform Commercial

Code may take place through conduct as well as words. *See Owens v. Harnett Transfer Inc.*, 42 N.C.App. 532, 257 S.E.2d 136 (1979); *Gold Kist, Inc. v. Pillow*, 582 S.W.2d 77 (Tenn.App.1979); *see generally* Levie, *The Interpretation of Contracts in New York Under the Uniform Commercial Code*, 10 N.Y.L.F. 350 (1964). *Cf. Sinkwich v. E. F. Drew & Co.*, 9 A.D.2d 42, 189 N.Y.S.2d 630 (1959) (rule of practical construction for determining contractual obligations consistently with parties' conduct under the contract); NYUCC § 2–208(3).

■ Appellant also argues that its conduct in obtaining alternative training could not function as a waiver of the entitlement to simulator time, because appellee's officials knew at the time of the 1972 letter agreement reserving simulator training that appellant planned to train its pilots by other means, especially the flight school appellant then operated. Therefore, according to appellant, the parties contemplated that the simulator training would remain available despite appellant's alternative methods of training.[5] However, appellant's flight school did not have independent access to a simulator at that time, and the reservation of simulator time in the September, 1972, letter agreement is not inconsistent with the prospect of incorporating simulator training into flight school or other preparation of crews which would in the future initially operate aircraft, most of which had not yet been delivered at that time. Appellant's later actual conduct in fully training its initial crews for the aircraft by alternative means was, however, inconsistent with a claim under the contract to simulator time for preparatory training of an initial flight crew. The district court

---

5. Appellant would apply general contract principles to demonstrate that under New York law a reasonable time is available to demand performance of a contractual duty, if no time is specified in the contract. However, appellant seeks to rely upon cases involving real estate contracts which are not covered by the UCC: *Cherlin v. Lynch*, 50 A.D.2d 982, 376 N.Y.S.2d 651 (1976); *Southard v. Alford*, 50 A.D.2d 664,

374 N.Y.S.2d 832 (1975); *Soundview Woods, Inc. v. Town of Mamaroneck*, 14 Misc.2d 866, 178 N.Y.S.2d 800 (Sup.Ct.1958), *aff'd*, 9 A.D.2d 789, 193 N.Y.S.2d 1021 (1959). We consider this case to be resolved by specific UCC provisions relating to waiver and usage of trade, and cases involving non-Code transactions are not on point.

held that appellant waived the simulator training once appellant had its initial crew fully trained by other means and operating the aircraft. As we find no error in the district court's interpretation that the "initial training" under the contract was the training of an initial crew for the aircraft, we have little difficulty agreeing with the district court that appellant waived the training once the initial crew was fully qualified and actually flying the plane.[6]

Accordingly, the judgment of the district court is affirmed.

---

**6.** We note that appellant does not take the position that it retracted any waiver it may have made of the simulator training. *See* NYUCC § 2–209(5).