[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 10, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-14120

_____

D. C. Docket No. 01-00900-CV-BH-M

DWAYNE CLANTON,
JIMMY PRINCE,
KENT MARCUS,

Plaintiffs-Appellees
Cross-Appellants,

versus

INTER.NET GLOBAL, L.L.C.,
a.k.a. Inter.Net Global Ltd., a foreign
corporation,
INTER.NET US LTD.,

Defendants-Appellants
Cross-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

**(January 10, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

HULL, Circuit Judge:

In this diversity contract dispute, Inter.Net Global and Inter.Net U.S. (collectively "Appellant" or "Inter.Net") appeal the district court's entry of judgment in favor of Dwayne Clanton, Jimmy Prince and Kent Marcus ("Appellees").[1] Because under the relevant contracts Appellant did not assume the holdback obligation in issue, we vacate the district court's entry of judgment in favor of Appellees and remand with instructions to enter judgment in favor of Appellant.

## I. BACKGROUND

### A. PSINet Owes "Holdback" to Appellees

In 1996, Appellees founded ZebraNet, Inc., an internet service provider. ZebraNet connected customers to the internet for a monthly fee. In October 1999, PSINet, a much larger internet company, offered to buy ZebraNet. Appellees accepted PSINet's offer and executed a "Merger Agreement" with PSINet. Among other things, the Merger Agreement obligated PSINet to pay Appellees $5,436,328 in cash at closing and an additional $992,250 in cash, plus interest, by April 2001.

---

[1]Inter.Net U.S. was a wholly owned subsidiary of Inter.Net Global, which in turn was a wholly owned subsidiary of PSINet. For purposes of this litigation, there is no meaningful distinction between the two Inter.Net entities, and they are referred to collectively as simply "Inter.Net" or "Appellant."

The deal closed, and Appellees received the $5,436,328. The remaining $992,250 owed by PSINet to Appellees is known as the "holdback" – the payment still owed by PSINet to Appellees but held back until the merger was complete.

The October 1999 Merger Agreement between PSINet and Appellees also included a clause governing assignment of the rights and obligations under the Merger Agreement. That clause stated that

> [n]either this Agreement nor any of the rights or obligations hereunder . . . may be assigned by a party hereto without the prior written consent of the other parties, except that [PSINet] may assign this Agreement to any subsidiary or affiliate prior to or after the Closing, by prior written notice to the [Appellees].

In other words, the Merger Agreement required that PSINet notify Appellees in writing prior to transferring to a PSINet subsidiary "any of the rights or obligations" arising under the Merger Agreement. It is undisputed that PSINet never gave any notice to Appellees that its holdback obligation under the Merger Agreement had been assigned to any subsidiary. Rather, PSINet has consistently taken the position that its holdback obligation always remained with PSINet.

## B. PSINet Transfers Certain Assets to Inter.Net

Although PSINet contends that the holdback obligation was never assigned to a subsidiary, Appellees assert that it was transferred by PSINet to its subsidiaries, Appellant Inter.Net in this case. Thus, we review in detail PSINet's

3

agreement with Inter.Net.

In March 2000, PSINet created two subsidiary companies, Inter.Net Global and Inter.Net U.S. On April 1, 2000, PSINet entered into two contracts, the first transferring assets to Inter.Net Global and the second transferring those assets from Inter.Net Global to Inter.Net U.S. These contracts are referred to as the "April 2000 Contribution Agreements." Under the Agreements, PSINet transferred to Inter.Net a specific list of non-fixed assets, in particular roughly 600,000 internet service customers of PSINet, which included the customers of the former ZebraNet.

On July 1, 2000, PSINet transferred a second set of assets to Inter.Net through two additional contracts, known as the "July 2000 Contribution Agreements." The assets transferred included thirty-seven specific assets formerly owned by ZebraNet, including things like office furniture.

The parties in this case do not dispute which assets PSINet transferred to Inter.Net. Instead, their dispute is over which liabilities were transferred to and assumed by Inter.Net. Specifically, the parties dispute whether Appellant Inter.Net agreed to assume PSINet's holdback obligation to Appellees.

Each of the four Contribution Agreements includes identical language under a contract clause entitled "Assumption of Liabilities." This clause states that

4

> [Inter.Net] hereby does assume and agree to pay, perform and discharge all debts, obligations, contracts and liabilities of [PSINet] properly allocable and attributable to or arising from the Transferred Assets of every kind, character or description, whether accrued, absolute, known or unknown, contingent or otherwise, including, without limitation (but only insofar as they relate to the Transferred Assets), . . . all obligations of [PSINet] existing or arising under the contracts, agreements and arrangements described in Schedule A hereto; provided, however, that [Inter.Net] shall not assume any debt, obligation, contract or liability of [PSINet] not specifically assumed as provided above.

(Emphasis added). Thus, under the Assumption of Liabilities clause in the Contribution Agreements, Inter.Net assumed and agreed to pay all liabilities "properly allocable and attributable to or arising from the Transferred Assets." This same clause also "provided, however, that Inter.Net shall not assume any debt, obligation, contract or liability of PSI not specifically assumed as provided above."

The Contribution Agreements between PSINet and Inter.Net contain no reference to the remaining holdback liability owed by PSINet to Appellees pursuant to the October 1999 Merger Agreement. Moreover, as noted earlier, prior to executing the 2000 Contribution Agreements with Inter.Net, PSINet did not provide written notice to Appellees to inform them that PSINet would be transferring to Inter.Net either the entire Merger Agreement or PSINet's remaining holdback liability to Appellees.

5

After the April 2000 and July 2000 Contribution Agreements were executed, PSINet continued to list the holdback obligation as an outstanding liability in its financial statements. Inter.Net's financial statements never listed the holdback liability.

On March 1, 2001, PSINet sold its Inter.Net subsidiaries to a number of individuals. The contract transferring Inter.Net to its new owners expressly stated that PSINet retained all holdback obligations, including the ZebraNet holdback liability.

## C.  PSINet Files for Bankruptcy

The Merger Agreement's April 2001 deadline passed without PSINet paying Appellees the holdback. Due to the burst of the internet bubble, PSINet filed for Chapter 11 Bankruptcy on May 31, 2001. In PSINet's bankruptcy filing, PSINet listed the ZebraNet holdback obligation as unsecured debt of PSINet and did not mention Inter.Net in relation to the holdback.

On February 5, 2002, Appellees filed proofs of claim for the holdback money in PSINet's bankruptcy proceeding. Appellees eventually prevailed on their claims in PSINet's bankruptcy and received slightly less than $100,000 from PSINet's Trustee as an initial payment on their holdback claim. Appellees also received notice that additional payments on their holdback claim might be

6

forthcoming from PSINet's bankruptcy.

**D.      Appellees Sue Inter.Net to Recover the Holdback**

In the meantime, Appellees also filed the instant lawsuit in Alabama state court in December 2001. Inter.Net removed the case to federal court in Alabama's Southern District. Appellees' complaint raised five claims,[2] only one of which (Count Five) is at issue in this appeal. In Count Five, Appellees claimed that Inter.Net, as successor to PSINet, was liable for the holdback owed to Appellees. Specifically, Appellees argued that when PSINet transferred the assets formerly owned by ZebraNet to Inter.Net, PSINet also necessarily transferred the remaining holdback liability owed under the original Merger Agreement between PSINet and ZebraNet.

During the course of the pretrial proceedings, the district court ruled that under the Contribution Agreements, Appellant Inter.Net had assumed PSINet's holdback liability, effectively granting partial summary judgment in favor of Appellees and against Inter.Net as to Count Five. A jury trial was held on July 12-14, 2004. Before Appellees' case was considered by the jury, the district court granted Inter.Net's motion for judgment as a matter of law on all remaining counts. The district court then entered judgment against Appellant Inter.Net and in

---

[2] The relevant complaint is the second amended complaint filed October 15, 2002.

Appellees' favor on Count Five, awarding Appellees the $992,250 holdback, plus interest, but minus any amount paid to Appellees pursuant to PSINet's bankruptcy.

Appellant Inter.Net now appeals the entry of judgment on Count Five.[3] Appellees cross-appeal, arguing only that the district court erred in its computation of the prejudgment interest awarded under Count Five.

## II. DISCUSSION

### A. New York Law

"In determining which law applies, a federal district court sitting in diversity must apply the choice of law rules of the forum state." Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc., 92 F.3d 1110, 1115 (11th Cir. 1996) (citation omitted). Alabama is the forum state in this case. To determine which law applies in contract disputes, Alabama courts "first look to the contract to determine whether the parties have specified a particular sovereign's law to govern." Stovall v. Universal Const. Co., Inc., 893 So.2d 1090, 1102 (Ala. 2004) (citation omitted). All the contracts in this case contain choice-of-law clauses stating that New York law applies, including the Merger Agreement between PSINet and Appellees and

---

[3]Both parties agree that the district court's various rulings together amount to a grant of partial summary judgment in favor of Appellees. See Capuano v. United States, 955 F.2d 1427, 1432 (11th Cir. 1992). We review de novo a district court's grant of partial summary judgment. O'Neal v. United States, 258 F.3d 1265, 1270 (11th Cir. 2001).

the four Contribution Agreements between PSINet and Inter.Net. Thus, we first conclude that the substantive law of New York controls this dispute.

Under New York law, "a corporation that merely purchases the assets of another corporation is not liable for the seller's debts and liabilities." Cargo Partner AG v. Albatrans Inc., 207 F.Supp.2d 86, 93 (S.D.N.Y. 2002) (citations omitted). Thus normally, Appellant Inter.Net's acceptance of the former ZebraNet assets from PSINet would not have entailed acceptance of PSINet's holdback liability, and Appellees would have no recourse against Appellant Inter.Net. However, under New York law, there are four situations where an asset sale does give rise to successor liability, including where "there is an express or implied agreement to assume the other company's debts and obligations." Eclaire Advisor Ltd. as Trustee to Daewoo Int'l (America) Corp. Creditor Trust v. Daewoo Eng'g & Constr. Co., Ltd., 375 F.Supp.2d 257, 267 (S.D.N.Y. 2005) (applying New York law).[4] Consistent with this principle of New York law, the Contribution Agreements "provided, however, that [Inter.Net] shall not assume any debt, obligation, contract or liability of [PSINet] not specifically assumed as provided

---

[4]The other three situations where an asset transfer gives rise to successor liability under New York law are inapplicable here. Those include: (1) where the transaction transferring assets was fraudulent; (2) where there was a de facto merger or consolidation of the companies; or (3) where the purchasing company was a mere continuation of the selling company. Eclaire Advisor, 375 F.Supp.2d at 267.

above."

Thus, under New York law, the contract issue in this case becomes whether, in the Contribution Agreements, Inter.Net specifically assumed PSINet's holdback liability to Appellees.

## B.    Inter.Net Did Not Assume the Holdback

The district court's partial summary judgment order is founded on the conclusion that under the "Assumption of Liabilities" clause in the Contribution Agreements, Inter.Net expressly assumed PSINet's holdback liability.  As such, this case turns entirely on the proper interpretation of the "Assumption of Liabilities" clause, which provided that Inter.Net assumed all liabilities "properly allocable and attributable to or arising from the Transferred Assets."

The Assumption of Liabilities clause is unambiguous on its face.  Under that clause, Inter.Net assumed all liabilities specifically tied to the named assets transferred.  Thus, we examine what assets were transferred under the various Contribution Agreements and whether the holdback obligation is "allocable and attributable to or arising from" those specific transferred assets.

In the April 2000 Contribution Agreements, PSINet transferred to Inter.Net 600,000 customers, including the accounts of the former ZebraNet's customers. Accordingly, under the Assumption of Liabilities clause of the Contribution

Agreements, Inter.Net also assumed responsibility for contracts and liabilities specific to those customers. For example, where PSINet had a contractual obligation to provide a particular ZebraNet customer with internet service, PSINet transferred that obligation, along with the ZebraNet customer, to Inter.Net.

Likewise, in the July 2000 Contribution Agreements, PSINet transferred to Inter.Net thirty-seven named assets listed on Appendix A to the Agreements. Those thirty-seven fixed assets consisted primarily of computers and office furniture. The Assumption of Liabilities clause in the July 2000 Contribution Agreements meant that Inter.Net assumed any liabilities directly related to those thirty-seven assets. For instance, had ZebraNet (and in turn PSINet) leased one of the listed pieces of furniture, Inter.Net would be liable for the remaining obligations under that lease.

In contrast, the holdback liability is not allocable or attributable to any of the specific assets formerly owned by ZebraNet and transferred to Inter.Net under the Contribution Agreements, and thus Inter.Net did not assume the holdback liability. Furthermore, the holdback liability arises from the Merger Agreement under which PSINet purchased the entirety of ZebraNet, and PSINet's contractual rights under the Merger Agreement were not listed as transferred assets in any of the Contribution Agreements. Because PSINet never transferred its contractual rights

11

under the Merger Agreement to Inter.Net, Inter.Net did not assume that contract or PSINet's holdback obligation arising under it.  As such, the Contribution Agreements did not transfer the holdback liability to Inter.Net.

That PSINet did not transfer, and indeed that Inter.Net did not assume, the holdback liability to Inter.Net is made further clear by the fact that PSINet transferred only some of the assets formerly owned by ZebraNet to Inter.Net in each of the Contribution Agreements.  Contrary to the district court's order, which focused on the July 2000 Contribution Agreements, the entire holdback liability did not arise from and cannot be allocated to the assets PSINet transferred under those Agreements.[5]  The holdback liability cannot be allocated to any particular

_____

[5]According to the district court,

> "the language [of the Assumption of Liabilities clause] is unambiguous and . . . is broad enough to encompass the Holdback Liability because such liability is clearly **attributable to** and is **arising from** the "Fixed Assets – Zebranet" set forth in Appendix A of [the July 2000 Contribution] Agreements. . . .  There can be no doubt that the Holdback Liability occurred in consequence of or on account of PSINet's acquisition of the ZebraNet assets conveyed pursuant to the [July 2000] Contribution Agreements.  In other words, the Holdback Liability would not exist but for PSINet's purchase of the ZebraNet assets at issue."

(Emphasis added).

While it is true that PSINet would not have owed the holdback liability had it not acquired ZebraNet and all of its assets, we disagree that the Assumption of Liabilities language was as broad as the district court concluded.  The words "properly allocable or attributable to or arising from the Transferred Assets" do not suggest the broad definition created and applied by the district court, which added the phrase "on account of PSINet's acquisition of the ZebraNet assets."  Rather, under the Assumption of Liabilities clause, the only liabilities assumed by Inter.Net were those that arose from the transferred assets themselves, not liabilities that arose from PSINet's prior acquisition, through the Merger Agreement with Appellees, of ZebraNet and all of its assets.

12

desk or computer named in Appendix A's list of ZebraNet fixed assets transferred by the July 2000 Agreements, nor even to all of those fixed assets taken together. Further, some of the assets formerly owned by ZebraNet had already been transferred to Inter.Net by the April 2000 Agreements, and some remained with PSINet even after both sets of Contribution Agreements.[6] As such, it is clear that the holdback liability remained at all times with PSINet and was never assumed by Inter.Net.[7]

## C. Parol Evidence

The parties also make lengthy arguments about the parol evidence submitted in this case. Under New York law,[8] "the parol evidence rule requires the exclusion

---

The district court erred because the holdback obligation arose under the Merger Agreement, was not mentioned in the Contribution Agreements, and did not arise out of the specific assets transferred to Inter.Net by the Contribution Agreements. In addition, the district court failed to consider the proviso language of the Assumption of Liabilities clause, which provides that Inter.Net "shall not assume any debt, obligation, contract or liability of PSI not specifically assumed as provided above." New York law, which we are required to apply here, would give plain effect to this unambiguous contract provision, and Inter.Net did not assume any liability not specifically provided for in the Contribution Agreements.

[6]For example, several accounts receivable and other cash assets PSINet acquired from the former ZebraNet were not transferred to Inter.Net under either the April 2000 or July 2000 Contribution Agreements.

[7]On appeal, Inter.Net also contends: (1) that the district court's grant of partial summary judgment was procedurally improper; and (2) that the position Appellees took in the PSINet bankruptcy proceeding judicially estops Appellees from asserting that PSINet transferred the holdback liability to Inter.Net. Because we rule in Inter.Net's favor on the basis of the substantive terms of the relevant contracts, we need not reach these issues.

[8]Because "[t]he parol evidence rule is a substantive rule of law," New York's parol evidence rule as to contracts, not Alabama's, controls the parol evidence the court may consider when interpreting the contracts. See Seguros Del Estado, S.A. v. Scientific Games, Inc., 262

13

of evidence of conversations, negotiations and agreements made prior to or contemporaneous with the execution of a written contract which may tend to vary or contradict its terms." U.S. Fire Ins. Co. v. Gen. Reinsurance Corp., 949 F.2d 569, 571 (2d Cir. 1991) (quoting 67 Wall St. Co. v. Franklin Nat'l Bank, 333 N.E.2d 184,186-87 (N.Y. 1975) (brackets omitted)).

Some New York decisions suggest that the parol evidence rule also excludes evidence of post-execution conduct in the interpretation of an unambiguous contract, but other New York decisions suggest that the rule does not bar consideration of the parties' conduct after contract formation. Compare Slatt v. Slatt, 64 N.Y.2d 966, 967 (N.Y. 1985) and Robinson v. Robinson, 440 N.Y.S.2d 127, 129 (N.Y. App. Div. 1981),[9] with Muzak Corp. v. Hotel Taft Corp., 133 N.E.2d 688, 690 (N.Y. 1956) and Sinkwich v. E.F. Drew & Co., 189 N.Y.S.2d

_____

F.3d 1164, 1175 n.16 (11th Cir. 2001).

[9]In Int'l Klafter Co., Inc. v. Cont'l Cas. Co., Inc., 869 F.2d 96 (2d Cir. 1989) (applying New York law), the Second Circuit stated that

> "[i]t is a fundamental principle of contract interpretation that, in the absence of ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible. Consequently, any conceptions or understandings any of the parties may have had during the duration of the contracts is immaterial and inadmissible. Since the language of the contracts is unambiguous, there is no need here to examine the conduct of the parties over the intervening years to ascertain their intent."

Id. at 100 (citing Slatt v. Slatt, 64 N.Y.2d 966, 967 (N.Y. 1985)); see also Metro. W. Asset Mgmt v. Shenkman Capital Mgmt, Inc., No. 03-5539, slip op. at 8 (S.D.N.Y. Aug. 16, 2005) (interpreting New York law) (stating that evidence of the parties' post-execution course of conduct may be considered only when the disputed contractual provisions are ambiguous).

14

630, 634 (N.Y.App. Div. 1959). We need not resolve this parol evidence issue, however, because the post-execution conduct of both PSINet and Inter.Net, the only parties to the Contribution Agreements, uniformly confirms that the holdback liability remained solely with PSINet and that Inter.Net never assumed that liability.

First, even after the April 2000 and July 2000 Contribution Agreements were executed, PSINet continued to list the holdback amount as an outstanding liability in its financial statements, while Inter.Net's financial statements never listed the holdback liability. Thus, the conduct of both PSINet and Inter.Net is entirely consistent with the unambiguous language of their contract.

Second, the March 2001 contract by which PSINet sold the Inter.Net subsidiaries to individuals expressly stated that PSINet retained the ZebraNet holdback liability. Had PSINet earlier transferred its holdback liability to Inter.Net through the Contribution Agreements, this clause in a subsequent sale arguably would have been nonsensical.

Third, in PSINet's May 2001 bankruptcy filing, PSINet listed the ZebraNet holdback obligation as an unsecured debt. If, in the Contribution Agreements, Inter.Net had assumed the holdback liability, PSINet presumably would have indicated that Inter.Net, not PSINet, was primarily obligated to pay this debt owed under the Merger Agreement.

15

In sum, the unambiguous language of the Assumption of Liabilities clause, as well as all evidence external to the Contribution Agreements, confirms that Inter.Net did not assume, and PSINet solely retained, the holdback liability and that Appellees may not recover the holdback from Inter.Net.[10]

## III. CONCLUSION

For the reasons set forth above, the district court's entry of judgment in favor of Appellees is VACATED, and the case is REMANDED with instructions that the district court enter final judgment in favor of Appellant on Count Five of Appellees' Complaint. Because we vacate the judgment in favor of Appellees, Appellees' cross-appeal seeking additional prejudgment interest is dismissed as moot.

**REVERSED, VACATED, and REMANDED with Instructions.**

---

[10]Merely as an aside, the pre-execution parol evidence also confirms that Inter.Net did not assume the holdback obligation. PSINet and Inter.Net officials testified without contradiction that the Contribution Agreements were not intended to transfer the holdback liability from PSINet to Inter.Net. In addition, the Merger Agreement between PSINet and Appellees required that PSINet notify Appellees in writing prior to transferring to a subsidiary the Merger Agreement or the holdback liability arising under it. PSINet did not provide such notice to Appellees prior to executing the Contribution Agreements with Inter.Net.

16